Stage 3-4-0-3 Solargenix Energy v. Acciona With the lawyers who can argue the case, please approach the bench and introduce yourself. Good morning, Your Honor. Michelle Oterizzi for the Spanish Defendants. Rob Hockman on behalf of Solargenix. You're going to reserve some time for rebuttal, I see. Yes, Your Honor, I'd like to. May it please the Court, Your Honor, I represent two Spanish defendants, Acciona S.A. and Acciona Energia. Judge Taylor very helpfully included in his opinion, which is on page 3 of our appendix, an organizational chart. So you can see that Acciona S.A. is the ultimate publicly held parent company. And this is only part of the corporate structure here. Energia is a mid-level, if you will, subsidiary. It's a large operating company in its own right. And then you get down to the U.S. subsidiaries who we agree are properly sued in this case because there is jurisdiction over them. They are all subsidiaries of Energia. And this morning, if I could, because this is a very complicated case with a lot of factual issues, I'd like to concentrate on Acciona S.A. because as to the ultimate parent company, we think it's clear that plaintiff has not come forward with even a prima facie case under any theory for obtaining personal jurisdiction over Acciona S.A. Now this jurisdictional issue was decided only on documentary evidence, is that correct? That's correct, Your Honor. So your review of it is de novo. We asked for an evidentiary hearing in the event that the court found that there were evidentiary issues, but because of the way Judge Taylor decided the issue, he found that he didn't need to decide any factual issues, actually. And his opinion really raises a threshold legal question, and that is when you have consent to suit a forum selection clause in an agreement and you have two defendants who are not signatories to that agreement, what's the standard that governs whether that forum selection clause constitutes a submission to jurisdiction? And we agree that if you actually consent to a clause that says you waive jurisdiction, that you have, of course, consented to be sued in that jurisdiction. But what Judge Taylor said is even without consent, that type of a provision applies if the parties in question are so closely related to the dispute such that it was foreseeable that it would be bound by the clause. And we think that that is a wrong standard as a matter of law and as a matter of due process. Because this I... Well, he didn't take that theory out of the air that he have legal authority to support that. What he had, Your Honor, is a series of mostly federal cases. And as we pointed out in our brief, virtually all of those cases involve not the issue of personal jurisdiction, but rather the issue of venue. A lot of them are cases where a plaintiff who's agreed to a forum selection clause sues in the wrong forum and the question is whether a non-signatory defendant can take advantage of them. Some of them are a non-signatory defendant, but in most of those cases, there's no question of personal jurisdiction in the forum. It's just a question, and when you're dealing with venue, that's a question of fairness, it's a question of convenience, and it's a different standard. There's only two cases that they cite where the court applied the same test to personal jurisdiction issues. And it did it without, in those cases, without any real analysis. We think we've distinguished the cases in our brief on the facts. What two cases are you referring to? I believe it's the F.C. Stone case, it's a case where the spouses sue, and the other case escapes me at the moment. But in those cases, as I say, I think they're distinguishable, but in any event, the courts apply the principle without really thinking about whether it should apply to personal jurisdiction. And if you look at the Burger King case, which is sort of the source of this, the U.S. Supreme Court case that we cite in our brief, where it talks about how agreeing to a forum selection clause is consenting to jurisdiction, that makes sense because you're actually consenting. And that should be the rule here, not this sort of amorphous, are you closely related enough to the dispute, so that you should have foreseen that you would be subject to a clause that you didn't agree to? First of all, it's circular. How is it foreseeable that you would have agreed to a clause that you didn't agree to? Well, you know, the letter of adhesion says that there was an agreement to be bound by three particular paragraphs, right? By anarchy, yes, Your Honor. You don't want to talk about it? No, I'm happy to talk about that, Your Honor. All right, so I understand it's a different issue, but the letter of adhesion, maybe we'll side-check it a little bit, the letter of adhesion says that there's going to be an agreement as to three particular paragraphs. And the rest of the agreement, I'm sorry, the forum selection clause says that every dispute arising under any paragraph of this agreement is going to be resolved in Illinois. So isn't it foreseeable for Energia to know that since every dispute arising under any paragraph in this agreement is going to be in Illinois, and you're agreeing to any paragraph or three paragraphs, that you're going to get hauled into Illinois courts? That's a question of intention, as opposed to our last case. It's really not a question of intention, because whether you want to be in Illinois or not is a question. The question is, is it foreseeable that you're going to wind up in Illinois? Well, two things, Your Honor. I disagree that the question is whether it's foreseeable that you're going to wind up here, because that's related to the specific jurisdiction test, which only applies if your conduct makes it in Illinois, related to Illinois, makes it foreseeable that you will be sued in Illinois. Not this whether a clause in an agreement. So I think we go back to the argument that it really has to be real consent. You have to have agreed. And on the second point, they deliberately left out the provision on forum selection, which by its terms applies only to the parties to the agreement. It doesn't purport in the cooperation agreement itself to apply to anybody else. And in the letter of adhesion, they don't incorporate by reference that particular paragraph. They only incorporate the other paragraphs of the particular paragraphs of the agreement that they were bound by. And, of course, as to ACCIONA S.A., they don't sign the letter of adhesion. They're not a party to anything. And the only close relationship that Judge Taylor really identifies is that they're the parent company. So what you have is a holding that if you're the parent company of far down the chain indirect subsidiary that signs an agreement, and you know they're signing the agreement, which ACCIONA S.A. absolutely did, you know they're signing it, then you've consented to be sued in Illinois. And we think that that goes way beyond due process. Well, your clients were very heavily involved in negotiating and approving the joint venture agreement, weren't they not? Well, no, Your Honor, I don't think. Again, we have to separate the two entities because what SolarGenics has done in this case is always wanting to put them together and treat all the ACCIONA companies as if they're a single entity. And as to ACCIONA S.A. in particular, there's no evidence that it participated in negotiating this agreement. It's the ultimate parent. Did it know about the agreement? Sure. But some of the e-mails and documents that plaintiffs have cited in their brief to show that they knew what was going on are seven months before they signed the agreement. And there's no evidence, there's nothing in the agreements that says that they were subject to approval by the parent company. And even if they had been, that's what parents do. And if we start subjecting parent companies to jurisdiction in a place that they have no connection to otherwise, simply because their subsidiaries enter into a contract there, then we've really changed the rules on personal jurisdiction. And we've done it in a way that I think is contrary to where the U.S. Supreme Court is currently going. We've cited to your honors in supplemental filing the Daimler v. Bauman case because that deals with general jurisdiction, which is one of plaintiffs' backup arguments. Yeah, but from the beginning of time in our jurisprudence, you know, our Supreme Court has always been talking about minimum context. Yes, right. And, you know, when you are heavily involved in negotiating and approving an agreement, you know, that could be construed to be a minimum context. Well, your honor, again, I'll go back to ACCIONA S.A. The minimum context have to relate to the specific claim, right? They have to be claim specific. The only claim against ACCIONA S.A. is for tortious interference with this agreement. There's no claim against ACCIONA S.A. for breach of the agreement, for fraud in the inducement. There are claims against NRHEA as to that, and we concede that there are lots of factual issues on that if you were to go to the issue of specific jurisdiction. There is no minimum context that relates to that specific claim, and therefore there shouldn't be specific jurisdiction. And what they're doing here is bootstrapping this contract argument and kind of grafting it on to specific jurisdiction in a way that we think just doesn't work, at least not in the absence of actual consent. And the Illinois courts have come up with a standard in the context of arbitration claims and whether or not non-parties are subject to an issue of consent. And that standard is, are you a third party beneficiary of the agreement? ACCIONA S.A. clearly is not. Was the agreement signed by your agent on your behalf? That was certainly not true here. Is there veil pursing? No, that's not true here. So what we have is if you just take ordinary Illinois law, you can't show consent on the part of ACCIONA S.A. We don't have specific jurisdiction. And under Daimler v. Baumann, we also don't have general jurisdiction because ACCIONA S.A., which is a Spanish corporation with its principal place of business in Spain, is certainly not at home in Illinois, even though it has indirect subsidiaries that do business here. If your honors have no more questions, I'll save the remainder of my time. Thank you. Good morning, your honors. Rob Hockman again on behalf of Solargenics. I will try to confine myself also primarily to S.A. since that's what apparently is most important to me. S.A. is the main point of dispute at this point. I would begin with the legal proposition. I would just point out that while they criticize us for having only two, cited only two cases, Epstein-Stone and the other one, by the way, is Tate and Lyle, that's also cited in the briefs, that's from the New York Appellate Court. Both of those cases specifically apply the close relationship test in the context of a non-signatory defendant to a forum selection clause who there is no reason to believe has any minimum contacts with the forum state. And that's appropriate. And it's appropriate because of what a forum selection clause is. It's a contract doctrine. The close relationship test is a doctrine of contract law. Because forum selection clauses are enforced without regard to minimum contacts. They are not a minimum contacts principle. They are a question of when you are bound to adjudicate a dispute in a particular forum. And in this case, and I'm going to go through the facts hopefully in some detail in a moment, I just want to be clear as I do that through the rubric of the close relationship test, that we don't lose sight of the alternative grounds that we presented to Judge Taylor below  Obviously Judge Taylor didn't have any need to reach those and we agree with that ruling, but we don't want to lose sight that the amount of control and insinuation of the Spanish defendants, both Enerja and S.A., was so substantial here that it is impossible to have concluded, as a matter of fact, that there's no personal jurisdiction. With respect to the question of the negotiation of the agreements, I would say first of all, there's roughly eight volumes of records in this case and hopefully I can point out just a few pieces of evidence. We have obviously the affidavit of Solar Genetics' principal, Mr. Miles. That's a sort of summary statement of what we know. It's at C-128. What I'm going to talk about today is none of that. You can read that on your own and you can review that to get an overview. What I'm going to talk about are their own words. The emails that they wrote internally, the emails that they wrote to Mr. Miles, and their own deposition testimony. And Mr. Morales, who was the CEO of Enerja and an N.A. board member of S.A., when he sent Mr. DeMiguel to negotiate the final portion, to finally negotiate the agreement here in Chicago, Mr. DeMiguel is represented as the head of N.A. He was also a senior officer at Enerja. And this is what Mr. Morales said. He says, quote, it's at C-1425 on the record. Temporarily, I've asked Alberto DeMiguel to help me in agreeing with you the key questions regarding the company's structure for this project and also for the ones to come in the future. In other words, he's saying in no uncertain terms, I'm sending this other guy, but you're dealing with me. You're dealing with Enerja. And then he goes on to say, you're not just dealing with Enerja. Jose Manuel Entrecanales, an Acciona S.A. He's the CEO of the ultimate parent. Have full confidence on this. Acciona has its financial strength, has in its financial strength, a competitive advantage for these innovative projects and we should make use of it. He's P. They accuse us of mushing together Enerja and S.A. They did. That's the only reason we do it. Because they were representing this global company as precisely what was available to us when we entered into this agreement. In terms of S.A.'s role in the agreement, there's absolutely evidence that S.A., Mr. Entrecanales, had to approve the agreement. It's an e-mail from Mr. Morales to Mr. Entrecanales telling him the agreement's almost done and it's just going to be waiting for your approval soon. That's 1428 of the record. S.A. did due diligence on the deal. 1363 of the record. And S.A. clearly wanted to do the deal because S.A. wanted the technology to develop in Spain. 1375, 1405, 1430. These aren't our words. These are theirs. And then when you turn to the cooperation agreement, it says it in so many words. Page 77 of the record, I think it's A17 in their appendix, talks about one of the primary business purposes of this Chicago-created joint venture is to promote the joint venture as the investment vehicle and developer for future thermosolar power projects by the parties or their affiliates worldwide. They are specifically brought in as part of the parties. So you combine the terms of the agreement with the contemporaneous communications and it's clear that S.A. and Energia are intimately linked with this operation. And finally, you know, the last thing in the agreement that I think is worth calling out, in addition to the forum selection clause itself, which talks about transactions, not only documents delivered in connection with or subject to this, which deals with the letter of adhesion, Your Honor, but also any transaction arriving from or connected to any of the four buildings. The whole idea behind this was there were going to be projects worldwide. We were going to take this leading technology, promote it worldwide, and so the parties understood at the time that sure, things might go wrong anywhere in the world where we do this, but we want to have the certainty and reliability of any dispute regarding any transaction that takes place in the world would be here in Chicago. And if you go back to the forum selection clause cases, you go back to Burger King, and you'll see the actual origination of this doctrine is a case cited in Burger King called the Bremen. And the Bremen talks about this very policy being advanced by giving effect to forum selection clauses in international transactions where the parties need that kind of certainty or desire that kind of certainty. Going on to after the project, after the joint venture was formed, a man named Frank Gilardin comes in. He's the deputy, or sort of a deputy, to Mr. Entrepreneurialist at SA. He's, quote, a point person on international activities. He's deeply involved in the operations covering, quote, many different issues. This is, again, not us. That's Mr. DeMiguel's testimony at 485 of the record. He's involved in approving or rejecting ASP opportunities, 1621 to 1622. 1678, the board minutes show that Mr. DeMiguel needs to check with NRHIA before moving forward on projects. Remember, Mr. Gilardin, Mr. Entrepreneurialist, and Mr. Marasse, they have no role in the American subsidiaries. They have no official role in the American subsidiaries. They are doing this because, we allege, what happened is that when the Spanish defendants got control of the technology, they decided not to build up ASP's business. They didn't hire a CEO. They didn't hire senior executives at ASP. They left ASP to wither on the vine. They took it over. They made the decision to reject opportunities. We allege this in the complaint. And then they take it, they take the projects, and they promote them in Spain, which is carved out, and then they start seeking other opportunities with the technology outside of the carved out space. Let me ask you this. Should we make a bright line rule here? A bright line rule with respect to minimum... Jurisdiction. Well, I think probably not. I'm not sure you can do better than the formless of words that are out there in the law. What I think you can say here is this isn't a closed case because the degree of involvement of SA's people, Mr. Gillard in particular, he's talking about strategic positioning. We know from the earlier negotiations that SA was involved in approving and due diligence on the transaction. He's informing Mr. Entrecannales about the opportunities and the plans for ASP going forward. He's even getting involved in employment decisions because, remember, senior executives didn't exist at ASP. All of this is cited in our documents, cited in our briefs. Just to point a few out to you, 1621 to 1622, 1641, 1643. The trial court here, they said that they were closely related. That's right. Isn't that a bright line rule? No, it's not a bright line rule, I don't think. And I think that what you see in the cases that are out there on the closely related standard, and they're all over the country, nobody's saying that it's not the law, that closely related is a standard for binding a non-signatory to a forum selection clause. You see some of the Seventh Circuit cases in particular trying to struggle with some kind of clearer way to a clearer form of words, whether foreseeability does it or whether mutuality does it. I think at the end of the day, what does it here is the overwhelming, overwhelming documentary, testimonial evidence from the Spanish defendants themselves of their intimate involvement in the negotiation and even the operation of the Chicago Created Joint Venture. And remember, one of their subsidiaries, ASC, is nothing but a shell company to hold the stock. And its principal place of business is right here in Chicago, running ASP is ASC's only business. So when they insinuate themselves this deeply, including commingling employees, directors, officers, I think the travel between Illinois and Spain runs seven pages in this record. And nothing about the letter of adhesion takes anything away from this. Remember, the forum selection clause says it applies to any document delivered here under. And what is the letter of adhesion except a document delivered in connection herewith? That's what the forum selection clause says. And what is the letter of adhesion but that? And indeed, the letter of adhesion was characterized in testimony as, quote, part of the main ingredient. Again, not our words. That's a lawyer for SA, Mr. Figueroa, at 162 of the record. So when you sum it all up, basically the American subsidiaries weren't doing anything and weren't able to fulfill the obligations of the contracts. The evidence, overwhelming evidence from their own mouths is that they were running it. And so the circuit court was right to find a close relationship test amply satisfied here and base jurisdiction on that basis and could also have base jurisdiction on any of the alternative bases we provided in our brief. If there are no further questions... The challenge is that the use of that test on the basis that most of the cases that talk about it are venue cases as opposed to jurisdiction cases. Do you want to discuss that? Well, it doesn't work for F.C. Stone and Tate and Lyle. And remember, the significance of that is important. There was also a case just last week out of the District of D.C. If you'd like to see it, we'd be happy to provide it following the argument in a post-argument submission. Then make an immediate motion. We'll make a motion and we'll submit it to you for your review and obviously give them the opportunity to respond to it. But what that case makes abundantly clear is exactly what we're saying, which is that the forum selection dot clause is a contract doctrine. The close relationship test is a contract doctrine. And if, under the law, if you are bound as a matter of contract to litigate in the forum, you don't ask minimum contacts questions. You don't have to get into that. Here, as I've said, even if you did, even if you had to get into that, their substantial involvement more than amply satisfies minimum contacts. But the fact that some of the cases are only venue or some of the cases involve not defendants but plaintiffs, it's neither here nor there. The law is more broad than that. And they can't distinguish those other cases. Their position is that they're wrong as a matter of law and they have no case that holds that, none. You'd be the first. Thank you, Your Honors. Your Honors, you know, contract law, one of the reasons we have it is because we want to have certainty. And this closely related test, if you're using it as a substitute for consent, for what a contract said, is so amorphous and so slippery that no one could possibly know at the time they enter into this contract whether or not someone in the corporate family would be deemed to have consented. And counsel's arguments on the facts, I think, highlight that. If he talked about SA, he said, what did it say? What was its heavy involvement in the negotiations? Someone said there was the full support of the parent. Someone said they had to approve it in Spain. And that they wanted to do the deal. That's not involvement in the negotiations at all. That's a parent supervising its subsidiary. And then we hear, well, there was involvement after the deal was done in matters that have nothing to do with the claims against SA. SA is not being sued for allowing ASP to wither on the vine. That's not the claim against them. The claim against them is tortious interference. So were they supposed to know when they approved, assuming they did approve the agreement, were they supposed to know that they had consented to be sued in Illinois if sometime down the road there was a claim against them, a tort claim against them? I think that's really not realistic. And the consent here is completely fictional and contrary to due process. So we'd ask your honors. Are you giving up on Energia? Energia, no, your honor. I think that the argument on Energia is that on the form selection clause, if you look at the letter of adhesion, they didn't agree to it. And so what you're doing is you're imposing on them, you're saying you agreed to something that you specifically didn't agree to. And there is an element of ‑‑ it's nonsensical to say that you agreed to something that you specifically didn't agree to. We do concede, your honor, that there are, on their specific jurisdiction issues as to ACCIONA Energia, there are fact issues. There are issues as to who the parties who were negotiating this agreement were representing. They say they were representing the U.S. subs which signed the agreement. The other side says they were representing Energia. That's a factual issue that would have to be dealt with on remand. But we absolutely believe, your honor, that Judge Taylor was wrong in saying that either of these defendants was subject to the form selection clause. Thank you. Well, thank you for giving us this interesting case and we'll take it under advisement that the court will be adjourned.